[Doc. No. 35]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **TOMMY TRUONG and THU THI NGUYEN-TRUONG,**<br><br>                    **Plaintiffs,**<br><br>       **v.**<br><br>**DELTA INTERNATIONAL MACHINERY CORP. and DELTA POWER EQUIPMENT CORPORATION,**<br><br>                    **Defendants.** | **Civil No. 19-19384(JRP)(MJS)** |

<u>**R E P O R T   A N D   R E C O M M E N D A T I O N**</u>

    This matter is before the Court on the Motion to Exclude the Testimony and Report of Gerald Rennell ("Mr. Rennell") filed by defendants Delta International Machinery Corp. and Delta Power Equipment Corporation (collectively, "Delta" or "defendants") [Doc. No. 35] (the "Motion"). The Court is in receipt of the opposition of plaintiffs Tommy Truong and Thu Thi Nguyen-Truong (collectively, "plaintiffs")[1] [Doc. No. 40] and Delta's reply [Doc. No. 43]. Pursuant to FED. R. CIV. P. 78 and L. CIV. R. 78.1(b), the Court makes this Report and Recommendation without oral argument from the parties. This Report and Recommendation is issued pursuant

---

[1] Any reference by the Court to the singular "plaintiff" shall refer only to Tommy Truong.

1

to 28 U.S.C. § 636(b)(1). For the reasons to be discussed, it is respectfully recommended that defendant's Motion be DENIED.

## Background

The present action is a products liability case arising out of an injury to the right-hand of plaintiff, Tommy Truong. Plaintiff sustained the injury on October 30, 2017 while operating a table saw, the Delta Unisaw, Serial Number 87D18276, Model Number 34-806F (the "Unisaw"), during the course and scope of his employment as a cabinet maker for Viking Yachts ("Viking"). On October 29, 2019, plaintiffs filed the Amended Complaint against Delta seeking recovery under claims for Negligence, Breach of Warranty and violation of the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1, et seq. ("NJPLA"). See Doc. No. 5.

### i.   The Unisaw

The Unisaw is a general all-purpose industrial table saw designed to provide the operator with the ability to make many different types of cuts. When Viking purchased the Unisaw from Delta in 1989, it was sold with a 3-in-1 blade saw guard included. Ponko Tr. 31:20-24, 32:4-10. The 3-in-1 guard is an integrated riving knife featuring anti-kickback claws with a cover that is mounted to the Unisaw to be used for all through-cutting operations. Id. at Tr. 31:2-6. It takes approximately a half a minute to one minute to remove the 3-in-1 guard. Id. at Tr. 33:4-5. Delta also offered an optional overarm guard known as the

Uniguard, which Viking elected not to purchase. The Uniguard is an overarm guard featuring a splitter that mounts into the table component of the saw and sits over the machine. Id. at Tr. 34:14-17. The Uniguard is marketed as a versatile saw guard with practically no operational limitations. Id. at Tr. 45:24-25 – 47:1-2. There is "some difficulty" involved in removing the Uniguard. Id. at Tr. 3-9. Comparing the two guards, Delta's representative explained the Uniguard "basically forms the same function" as the 3-in-1 guard, except (for the Uniguard) that the splitter is not attached, the riving knife and anti-kickback claws are not attached to the hood as they are in the three-in-one." Id. at Tr. 34-18-21. Both the 3-in-1 and the Uniguard were capable of being used for the type of cut being performed by plaintiff at the time of the accident. Id. at Tr. 40:5-22. However, there are saw operations which, in order for the user to perform them, the user would have to physically remove the guards. Id. at Tr. 47:13-15. They are non-through cut dadoing, grooving types of those cuts." Id. at Tr. 47:18-19. Delta does not recommend that any cuts be made on a table saw without a guard in place. Id. at Tr. 98:15-17.

## ii. **The Accident**

At the time of the accident, plaintiff was making a 1 3/8-inch rabbet non-through cut from a walnut wood slab using the Unisaw. See Amended Compl. ¶ 16, 18; Wunder Tr. 26-27. Plaintiff testified that as he used a push stick to push his work piece as

3

he cut it, the push stick slipped and the notch in the push stick became loose from the piece of wood causing his hand to slip into the saw blade, which resulted in his right index finger being severed and the laceration of three others. See Amended Compl. ¶ 20; Truong Tr. 175–177. The saw was being operated by plaintiff without a guard system in place when the injury occurred. Truong Tr. 60.

### iii. Plaintiffs' Expert

Plaintiffs seeks recovery under the theory that Delta is liable for the manufacture, design assembly, distribution and sale of the Unisaw. To this end, plaintiffs have identified Mr. Rennell as a liability expert in this matter and served Delta with Mr. Rennell's Curriculum Vitae ("CV") and Expert Report, dated December 14, 2020 (the "Report"). Mr. Rennell has also testified in the form of a deposition on March 12, 2021. Plaintiffs describe that "Mr. Rennell's analysis and opinion articulates how the table saw was not reasonably fit, suitable or safe for its intended purpose because it was designed and marketed in a defective manner in that it did not include a more functional overarm guard and failed to contain adequate warnings and instructions." Opp. at 7. In summary, the Court derives the following relevant information from Mr. Rennell's report, CV, and deposition transcript.[2]

---

[2] The Court has a fully developed factual record before it sufficient to issue this Report & Recommendation without holding

Mr. Rennell presents as a "Safety Engineer" with specific expertise in machine guarding. Rennell Report at 1. His CV reflects, however, that Mr. Rennell is not a formally trained, professional engineer in the conventional sense. Rennell CV; Rennell Tr. 87:23-25 - 88:16, 47:20-25 - 48:3-10. Mr. Rennell is the current president of Technical Safety Associates – a consulting firm concerned with the safety of industrial manufacturing machinery for which he is apparently the sole employee. Rennell CV; Opp. at 24. By way of educational background, Mr. Rennell attended Detroit Institute of Technology focusing in "Occupational Safety"; Oakland Community College as a "General Academic"; and, General Motors Institute receiving "Safety Engineers Training". Rennell CV. In the workforce, Mr. Rennell served as a safety engineer with General Motors from 1969 to 1971. Id. He then worked for Michigan Mutual Insurance Company as an industrial safety and loss control consultant from 1972 to 1977. Id. From 1977 to present, Mr. Rennell has been a safety consultant for McCarthy

---

an evidentiary hearing. See Oddi v. Ford Motor Co., 234 F.3d 136, 154 (3d Cir. 2000) (finding that because "the district court already had before it the depositions and affidavits of the plaintiff's experts . . . [n]othing more was required"); Henry v. St. Croix Alumina, LLC, 572 F. App'x 114, 119 (3d Cir. 2014) (observing that "a hearing is not required where the District Court is presented with a full record"). Here, the issues have been extensively briefed by both sides, with the parties' submissions containing voluminous exhibits including Mr. Rennell's Report and deposition testimony transcript, numerous fact witness deposition transcripts, court opinions, and more. Indeed, the sum total of both parties' filings is over seven hundred pages.

Robinson and Technical Safety Associates. <u>Id.</u> As to his familiarity with table saws, Mr. Rennell reported having analyzed over one hundred table saws for proper guarding. Report at 1. He further reported having conducted in-depth investigations of approximately twenty table saw injury accidents including accidents on 10' Delta table saws with splitter mounted guards. <u>Id.</u> While he has not designed table saws or their warnings, Mr. Rennell has designed guarding. Rennell Tr. 104:6-11; Reply, Moyran Cert., Ex. E, Affidavit of Gerald Rennell at ¶ 4.

In forming the opinions provided in his report, Mr. Rennell accounted for having reviewed (1) video[3] and photographs[4] of the Unisaw; (2) discovery documents provided by Delta including the manual for the Unisaw;[5] (3) discovery documents provided by Viking;[6] (4) the depositions of plaintiff (including attempted

---

[3] The Court notes that in his deposition testimony, Mr. Rennell responded "I don't think so" when asked if he relied on the video of the inspection. <u>Id.</u> at Tr. 119:12-14.

[4] The Court notes that in his deposition testimony, Mr. Rennell clarified that he relied on all the photographs provided to him (<u>id.</u> at Tr. 118:19-25), and that one photograph including a depiction of a push stick was "[t]he one that was important" to him (<u>id.</u> at Tr. 119:1).

[5] The Court notes that in his deposition testimony, when asked whether there was any specific Delta discovery documents he relied on in arriving at his opinions, Mr. Rennell responded that he relied on information regarding the age of the saw, when it was shipped, and the type of guard it was shipped with. <u>Id.</u> at Tr. 119:15-25, 120:1-9.

video demonstration of his injury) and three of plaintiff's supervisors at Viking as well as a Delta representative. Rennell Report at 1-2; Opp. at 8-9. The deposition testimony of Mr. Rennell reveals that while he represented he is "very familiar with the Delta ten-inch table saw[,]" (Rennell Tr. 105:9-10) he did not physically examine, inspect, or measure the subject Unisaw involved in this case (id. at Tr. 104:14-17, 105:16-23). In response to questions asking him to identify the last time he saw a Delta 34-806F or any Delta industrial table saw of any model number in operation, Mr. Rennell answered "I don't know" in both instances. Id. at Tr. 109:14-20. Mr. Rennell further testified that he did not perform any tests on the model table saw at issue in this case (id. at Tr. 124:18-20) and he did not watch anyone make any cuts using the Unisaw (id. at Tr. 125:1-8). In addition, Mr. Rennell testified that he has not conducted, nor does he know of any studies comparing the 3-in-1 guard to the Uniguard in the workplace. Id. at Tr. 159:7-19, 160:1-7. His opinions in that regard are instead based on personal experience. Id. at Tr. 160:6-17.

---

[6] The Court notes that in his deposition testimony, when asked whether there was any specific Viking discovery documents he relied upon in rendering his opinions he responded "[n]othing that I recall." Id. at Tr. 121:3-9.

Mr. Rennell ultimately opined the following to a reasonable degree of professional and safety engineering certainty at the close of his report:

1. The Delta Unisaw was defective and unreasonably dangerous in that Delta knew that the splitter mounted guard would be removed for narrow rip cuts and failed to warn and instruct on how to safely perform the type of rip cut being made by plaintiff.

2. If there had been an overarm guard on the Unisaw and the time of plaintiff's accident, his injury would not have occurred.

3. Overarm guards, including the Uniguard was on the market and available both prior to and at the time the Unisaw at issue was manufactured in 1989.

4. The 3-in-1 guard consists of three parts: a splitter, anti-kickback pawls, and a clear plastic blade cover. It should be used for all through cuts, those where the user is cutting all the way through a piece of material, slicing it into two pieces. It is more limited than the overarm type of guard because it cannot be used for non-through cuts, where the user is only cutting partway through the material and also cannot be used for narrow rip cuts without a false fence or similar addition. Delta admits that the Unisaw can be used without the 3-in-1 guard, as the guard must be removed for non-through cuts. Overarm guards can accommodate more types of cuts than 3-in-1 guards.

5. Delta Concedes that overarm guards can be left on the Unisaw "for a majority of non-through cuts." The Delta Unisaw, as designed, posed a substantial likelihood of harm because the 3-in-1 guard was likely to be removed by users.

6. By furnishing the saw with the 3-in-1 guard, Delta increased the likelihood that it would be removed and separated from the saw, creating a dangerous and unguarded condition of the Unisaw.

7. The Delta Unisaw was purposefully manufactured to permit its use without a key safety feature.

8. It was feasible to sell the Unisaw in a safe manner. Rather than including a 3-in-1 guard as standard, Delta should have equipped the Unisaw with an overarm guard. Overarm guards render the Unisaw safer because such guards can accommodate more cuts

and are thus less likely to be removed. The relatively low cost of the overarm guard and its operating advantages relative to Delta's standard 3-in-1 guard confirms that it was a feasible and cost effective way to increase the safety of the Unisaw and make it reasonably safe for its foreseeable users.

9.  The Uniguard differs in that the blade guard is not attached to the splitter and is an independent basket attached to a long pivoting aluminum arm rising from the side of the table. This blade guard can be swung up and out of the way while positioning the piece to be cut, and then lowered back down over the blade.

10.  According to the Instruction Manual, the Uniguard has practically no operational limitations and makes even rabbeting safer.

11.  Uniguard would not significantly interfere with the use of the Unisaw and the Uniguard can be used for almost all types of cuts.

12.  Delta had at its disposal the Uniguard that did not need to be removed for narrow rip or for non saw through cuts and was therefore a safe alternative to the splitter mounted guard. Safety of the saw user cannot be optional and therefore the Uniguard should have been standard equipment with the Unisaw and the sale of this Unisaw without the Uniguard created an unreasonably dangerous and defective product.

Rennell Report at 13-15.

Mr. Rennell's opinions fall into two general categories: (1) the Delta Unisaw was defective as designed because it was feasible to sell the Unisaw in a safe manner by including an overarm guard as a standard feature; and (2) the Delta Unisaw was defective and unreasonably dangerous in that Delta failed to warn and instruct on how to safely perform the type of rip cut being made by plaintiff.

Delta now moves to strike the expert report of Mr. Rennell and in its entirety preclude him from testifying at trial under the requirements of Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993) on the asserted grounds that (1) he is unqualified to render an opinion; (2) his opinion is unreliable as it is based solely on subjective beliefs; and, (3) his testimony will not aid the jury as his theory that a covered blade on a table saw is safer than an uncovered blade is not connected to reliable analysis or design safety. See <u>generally</u>, Mot.

## **General Legal Principles**

The standard of liability for claims brought under the NJPLA requires that a plaintiff must show "by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose." <u>N.J.S.A.</u> 2A:58C-2. This can be demonstrated by showing that the product (a) deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or (b) failed to contain adequate warnings or instructions, or (c) was designed in a defective manner. <u>Id.</u>

### i. **Expert Admissibility**

Federal Rule of Evidence 702 governs the admissibility of expert testimony, permitting a witness "qualified as an expert by

10

knowledge, skill, experience, training, or education" to testify in the form of an opinion, provided that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The requirements outlined in Rule 702 are referred to as qualification, reliability and fit. Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (citing Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)). The Third Circuit explained the three requirements as follows:

> First, the witness must be qualified to testify as an expert. Qualification requires that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such. Second, the testimony must be reliable. In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Third, the expert testimony must fit, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

Id. (internal quotations and citations omitted). Defendants challenge plaintiffs' expert on all three requirements. See generally, Mot.

### a. Qualification

The qualification prong of admissibility considers whether an expert is qualified "to render an opinion when he or she 'possesses specialized expertise.'" In re Human Tissue Prods. Liability Litig., 582 F. Supp. 2d 644, 655 (D.N.J. 2008) (quoting Pineda v. Ford Motor Corp., 520 F.3d 237, 244 (3d Cir. 2008)). This requirement, however, has been interpreted liberally to encompass "a broad range of knowledge, skills, and training." In re Paoli T.T. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). The criteria required to qualify an expert turn largely upon the subject matter of the particular opinion to be offered. Kerrigan v. Maxon Ind., 223 F. Supp. 2d 626, 635 (E.D. Pa. 2002). "[I]f the expert meets the liberal, minimum qualifications then the level of the expert's expertise goes to credibility and weight, not admissibility." Kannankeril v. Terminix Int'l Inc., 128 F.3d 802, 809 (3d Cir. 1997)(citing Paoli, 35 F.3d at 741). Further, "'[i]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'" Pineda, 520 F.3d at 244 (quoting Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)).

### b. Reliability

The reliability prong of admissibility concerns the reliability of the expert's methodology. See Fed. R. Evid. 702(c). The Third Circuit has explained that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Pineda, 520 F.3d at 244 (quoting Paoli, 35 F.3d at 742); see also In re TMI Litig., 193 F.3d 613, 663-64 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000). This has been interpreted to mean that an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590); see also Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 81 (3d Cir. 2017). "An expert opinion is not inadmissible because it may contain flaws, nor is it excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case; such vulnerabilities affect the weight of the testimony, not its admissibility." Feit v. Great-W. Life & Annuity Ins. Co., 460 F. Supp. 2d 632, 641 (D.N.J. 2006).

In evaluating whether an expert's particular methodology is reliable, the Third Circuit has explained that factors "deemed important" for determining reliability include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's

> operation; (5) whether the method is generally
> accepted; (6) the relationship of the technique to
> methods which have been established to be
> reliable; (7) the qualifications of the expert
> witness testifying based on the methodology; and
> (8) the non-judicial uses to which the method has
> been put.

Paoli, 35 F.3d at 791 n.8. This reliability framework governs both

technical and scientific expertise; however, these factors are not

exclusive, nor must they all be applied in every case. Kumho Tire

Co., 526 U.S. at 141, 151; Elcock v. Kmart Corp., 233 F.3d 734,

746 (3d Cir. 2000). The Supreme Court has admonished that

reliability factors (like those enumerated above) may not apply

with equal force in every setting. Rather, whether "specific

factors are, or are not, reasonable measures of reliability in a

particular case is a matter that the law grants the trial judge

broad latitude to determine." Kumho Tire Co., 526 U.S. at 153. In

this district, the Court in Milanowicz v. The Raymond Corp., 148

F.Supp.2d 525, 536 (D.N.J. 2001) reconfigured Daubert for

application to "technical" or "other specialized" subjects such as

engineering and identified the following several factors which

trial courts in this District have used in evaluating reliability:

> (1) federal design and performance standards, (2)
> standards established by independent standards
> organizations, (3) relevant literature, (4)
> evidence of industry practice, (5) product design
> and accident history, (6) illustrative charts and
> diagrams, (7) data from scientific testing, (8)
> the feasibility of any suggested modification, and
> (9) the risk-utility of any suggested
> modification.

14

Milanowicz, 148 F.Supp.2d at 536 (D.N.J. 2001); see also Florio v. Ryobi Techs., Inc., No. CV 17-5518, 2020 WL 5234924, at *5 (D.N.J. Sept. 2, 2020), appeal dismissed, No. 20-2857, 2021 WL 982250 (3d Cir. 2021); Ferriola v. Stanley Fastening Sys., L.P., No. CIV. 04-CV-4043(JEI), 2007 WL 4440215, at *2 (D.N.J. Dec. 14, 2007).

### c. Fit

Third, the expert's testimony must "fit" the case. Daubert, 509 U.S. at 592. Otherwise known as the "helpfulness" standard, this requires there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 591-92. The fit requirement "goes primarily to relevance." Id. "[T]he expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404 (3d Cir. 2003) (citations omitted).  The standard for fit is "not that high" but "is higher than bare relevance." Paoli, 35 F.3d at 745. Plaintiffs do not have "to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000). "A court 'must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.'" Id. (citing Heller v. Shaw

Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999)). "A court may conclude that there is simply too great a gap between the data and the opinion proffered." Id. (citations omitted).

## Discussion

As an initial matter, the Court must address Delta's request to strike Mr. Rennell's Affidavit. Delta argues the Affidavit, submitted as an attachment to plaintiffs' counsel's certification in opposition to Delta's Motion, constitutes an improper supplementation of Rennell's Report. If a party wishes to supplement the expert's report, it must follow the procedures of Federal Rule of Civil Procedure 26(e), which states that the duty to disclose is triggered when the party "learns that in some material respect the information is incomplete or incorrect." FED. R. CIV. P. 26(e). Rule 26(e) "does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect." Lockhart v. Willingboro High Sch., No. CV 14-3701, 2017 WL 11465996, at *3 (D.N.J. May 3, 2017) (citing Coles v. Perry, 217 F.R.D. 1, 3 (D.D.C. 2003)). Caselaw establishes that a supplement should be stricken if it contains new opinions or information which is contradictory to that set forth in the expert report (see Stein v. Foamex Intern., Inc., No. Civ. A. 00-2356, 2001 WL 936566 (E.D.Pa. Aug. 15, 2001)), but it need not be

16

stricken if it contains a statement that is merely "an elaboration of and consistent with an opinion/issue previously addressed" in the expert report. Emcore Corp. v. Optium Corp., No. CIV.A. 6-1202, 2008 WL 3271553, at *4 (W.D. Pa. Aug. 5, 2008) (citing Thompson v. Doane Pet Care Co., 470 F.3d 1201, 1203 (6th Cir. 2006)). A post-deposition supplemental affidavit will not be stricken when it "clarified and placed into context [the expert's] prior testimony." Taylor v. Cottrell, Inc., 795 F.3d 813, 818 (8th Cir. 2015). After conducting a careful review of Mr. Rennell's Report, his deposition testimony and the Affidavit, the Court does not find the Affidavit to introduce new opinion or contain conflicting statements that would warrant its exclusion. Rather, it primarily serves to elaborate on Mr. Rennell's experience and clarify earlier testimony.

The Court specifically rejects defendants' characterization of Mr. Rennell's statement regarding interlocks and other items as new opinion. Reply at 4. Read in context, this reference was included not to introduce a new opinion or proposed alternative design, but instead to explain that Mr. Rennell's guard-design experience is not disqualifying because the facts in this case only called for *selection* of a particular guarding device among several available options. Rennell Affidavit ¶ 14. The Court similarly rejects defendants' assertion that Mr. Rennell's Affidavit directly conflicts with his deposition testimony. The

four (4) statements in the Affidavit identified by defendants as being inconsistent with Mr. Rennell's testimony (see Reply at 4-5), when read in context, do not amount to contradictory information warranting exclusion of the Affidavit.

First, defendants claim Mr. Rennell's statement in his Affidavit that "I have in fact designed machine guarding" (Rennell Affidavit ¶ 4)conflicts with his deposition testimony – specifically with respect to Rennell Tr. 87:25 where he responded "[n]o" to the question posed by counsel "[h]ave you ever designed any component part of an industrial table saw?" (id. at Tr. 87:23-24). Closer inspection of the testimony reveals that when asked whether he was involved with machine design from the "ground up[,]" Mr. Rennell answered "[n]o. Just guard design." Id. at Tr. 91:1-5. Similarly, Mr. Rennell's statement that "I am not an engineer and designed guards . . ." (id. at Tr.44:13) is not inconsistent with the statement in his Affidavit at ¶ 4, as the former was in reference to his experience with General Motors, specifically. See Reply at 4-5. Thus, the challenged portion of Mr. Rennell's Affidavit is consistent with his deposition testimony and it was not improper for him to clarify his experience in this regard.

Second, defendants contend that Mr. Rennell's representation made in the Affidavit that "I have analyzed over one hundred table saws for proper guarding[]" (Rennell Affidavit ¶ 5) conflicts with the portion of his deposition testimony wherein he indicated, "I

would estimate that the number of saws I have looked at, analyzed them to determine the safeguard . . . it's closer to 20[]" (Rennell Tr. 34:20-25 to 35:1-4). See Reply at 5. This claim, however, misses the mark because the questions directly preceding this statement called for Mr. Rennell to respond by identifying the number of times he recommended use of an *overarm guard* (id. at Tr. 34:16-19), whereas his statement in the Affidavit at ¶ 5 spoke more generally about analyzing table saws for "proper guarding." Furthermore, this paragraph in the Affidavit repeats verbatim a representation made in the Report. Report at 1. Thus, the Court is unable to conclude that this amounts to contradictory statements.

Third, defendants challenge the propriety of the Affidavit based on Mr. Rennell's representation at ¶ 6 that he has completed approximately twenty investigations on injury accidents, including accidents involving ten-inch Delta table saws. See Reply at 5. Defendants specifically claim that this portion of the Affidavit conflicts with Mr. Rennell's testimony that he has served as an expert in ten or eleven cases involving table saws of different brands, some of which were not ten inch saws (see Rennell Tr. 36:12-15; 38:10; and 37:24 - 38:1). See Reply at 5. Defendants further point out that Mr. Rennell answered "I don't know" when asked about the last time he saw a Delta industrial table saw of any model in operation (Rennell Tr. 109:17-22). See Reply at 5. While perhaps creating an ambiguity or grey area, Mr. Rennell's

testimony is not inconsistent with the Affidavit on its face. Mr. Rennell identified the saws from each matter in which he served as an expert when responding to counsel's question: "have [you] ever been retained in a case . . . where you looked at the specific Delta table saw model 34-806F before this case?" Rennell Tr. 36:3-16. Thus, the testimony that is the subject of defendants' criticism was strictly with regard to prior casework in table saw accidents, whereas Mr. Rennell's statement in the Affidavit at ¶ 6 spoke more broadly of investigations. This understanding appears to align with Mr. Rennell's explanation of his investigation experience later in the deposition where he stated that, during his studies, he investigated an estimated twenty to twenty-five accidents. Id. at Tr. 196:3-5.

Fourth, and finally, defendants argue that the Affidavit should be stricken based on Mr. Rennell's statement providing "I have tested the 10 inch Delta table saw with both splitter mounted guards and Uniguards[]"(Affidavit ¶ 11). See Reply at 5. Defendants claim this statement conflicts with Mr. Rennell's deposition testimony in which he responded in the negative when asked by counsel "[s]pecifically for this case, Mr. Truong's case, did you perform any tests on this model table saw at all?" Rennell Tr. 124:17-20. These statements simply do not contradict one another. Rather, the Affidavit at ¶ 11 attempts to clarify the deposition statement by explaining that, despite not having performed any

20

testing in connection with this particular case, Mr. Rennell has conducted testing in the past. To the extent Mr. Rennell may have contradicted himself elsewhere in his deposition testimony, such discrepancies are more appropriately addressed at trial. The Court therefore declines to strike the Affidavit.

Delta directly challenges the adequacy of Mr. Rennell's qualifications and experience. Specifically, Delta seeks to preclude the testimony and opinions of Mr. Rennell, alleging he "does not possess the requisite engineering education, training, and experience to qualify in the specialized fields of power industrial table saw engineering design and human factors science of warnings and Instruction Manuals content design and construction." Mot. at 22-23.

Liberally applying the qualification requirement consistent with the Third Circuit's interpretation of FED. R. EVID. 702, the Court finds Mr. Rennell has demonstrated the minimum qualifications to testify as an expert here. Mr. Rennell's area of specialized knowledge in table saw guarding encompasses the subject matter of his testimony, and his practical experience as well as his training and credentials represent a match for the issues presented in this case. See Elcock, 233 F.3d at 741 (citing Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)). While he may not be a leading expert in power industrial table saw engineering design and human factors science of warnings and instruction

manuals content design and construction, the Court finds that the pertinent inquiry at this stage is whether the totality of Mr. Rennell's qualifications ensure that his knowledge of the subject matter will assist the trier of fact. See Lara v. Delta Intl Mach. Corp., 174 F. Supp. 3d 719, 733 (E.D.N.Y. 2016); Pineda, 520 F.3d at 244 (citing Holbrook, 80 F.3d at 782 (3d Cir.1996)("[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.");[7] Ruggiero v. Yamaha Motor Corp., U.S.A., No. CV 15-49, 2017 WL 1197755, at *5 (D.N.J. Mar. 31, 2017), aff'd sub nom. Ruggiero v. Yamaha Motor Corp., U.S.A, 778 F. App'x 88 (3d Cir. 2019) (citing Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 495 (D.N.J. 2002) ("[E]xclusion of an expert witness on grounds of qualifications alone is 'improper simply because an expert does not have the most appropriate degree of training.'"). Contrary to the contention of Delta, to meet Rule 702's liberal qualification requirement, it is not necessary that Mr. Rennell be substantively qualified in the design of industrial table saw engineering design or the drafting

---

[7] "The strengths and weaknesses of an expert's qualifications are instead frequently factored into the weight given to that expert's testimony, rather than its admissibility." Dymnioski v. Crown Equip. Corp., No. CIV. 11-3696, 2013 WL 2297035, at *2 (D.N.J. May 24, 2013).

of manual instructions. See Pineda, 520 F.3d at 245 (holding plaintiff's expert need not be substantively qualified in the design of automobile rear liftgates or the drafting of service manual instructions). Similarly, the fact that Mr. Rennell is not a "human factors" expert does not mean that there is no "specialized knowledge" he can provide to inform plaintiff's allegations that the instruction manual failed to adequately warn users of the Unisaw. See Holbrook, 80 F.3d at 782. Rather, the Court is satisfied that over the past forty years Mr. Rennell has acquired the minimum of education, training, and experience to testify about the design of the Unisaw and the adequacy of its instruction manual.

Having determined Mr. Rennell has crossed the foundational threshold of establishing his personal background qualifications as an expert, the Court turns to the substance of his opinions. Mr. Rennell's opinions fall into two general categories: (1) the Unisaw was defective as designed because it was feasible to sell the Unisaw in a safe manner by including an overarm guard as a standard feature; (2) the Delta Unisaw was defective and unreasonably dangerous in that Delta failed to warn and instruct on how to safely perform the type of rip cut being made by plaintiff. The Court will address each of these categories in sequence.

1. Opinion No. 1

> The Unisaw was defective as designed because it was
> feasible to sell the Unisaw in a safe manner by including
> an overarm guard as a standard feature.

To succeed on a products liability claim for a design defect, "[a] plaintiff must prove either that the product's risks outweighed its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm." Lewis v. Am. Cyanamid Co., 155 N.J. 544, 570 (1998). In an action brought under an alternative design theory, a plaintiff "'must prove under a risk-utility analysis the existence of an alternate design that is both practical and feasible,' and 'safer' than that used by the manufacturer." Diluzio-Gulino v. Daimler Chrysler Corp., 385 N.J. Super. 434, 438 (App. Div. 2006) (quoting Lewis, 155 N.J. 571); see also Florio v. Ryobi Techs., Inc., No. CV 17-5518, 2020 WL 5234924, at *7 (D.N.J. Sept. 2, 2020), appeal dismissed, No. 20-2857, 2021 WL 982250 (3d Cir. Feb. 2, 2021).

In the context of a Daubert challenge, courts in the Third Circuit often consider testing of proposed alternative designs when evaluating the reliability of an expert's opinion. See Ortiz v. Yale Materials Handling Corp., No. 03-3657, 2005 WL 2044923, at *6 (D.N.J. Aug.24, 2005). However, failure to test an alternative

design is not dispositive. <u>Kolokowski v. Crown Equip. Corp.</u>, No. CIV.A 05-4257, 2009 WL 2857957, at *7 (D.N.J. Aug. 27, 2009).[8]

The Court finds that Mr. Rennell's methodology as applied in this case is sufficiently reliable under the flexible standard adopted by this Circuit. The method employed by Mr. Rennell is straightforward and unremarkable: he conducted an investigation and, drawing on risk-utility analysis tools as well his specific knowledge and experience with similar guarding, which is beyond the ken of the average layperson, he formed an opinion.[9] He observed

---

[8] <u>See also</u> <u>Benitez v. JMC Recycling Sys. Ltd.</u>, No. CV 13-2737, 2017 WL 2815056, at *11 (D.N.J. June 29, 2017) (noting the absence of testing does not render expert's opinion unreliable <u>per se</u>, and testing is not necessary where the alternative design is on the market, or recognized in the industry, performing "the same or very similar function at lower risk and comparable cost."); <u>Lara-Arciniega v. Crown Equip. Corp.</u>, No. CIV. 06-0020, 2008 WL 2783341, at *6 (D.N.J. July 15, 2008) (permitting expert's testimony, absent testing, that all forklifts should be equipped with a battery retainer interlock system, which was sold only as an optional feature with the subject forklift); <u>Thomas v. CMI Terex Corp.</u>, No. CIV.07-3597, 2009 WL 3068242, at *8 (D.N.J. Sept. 21, 2009) (expert not required to test the alternative design, already in use on a similar piece of machinery, providing sufficient reliable proof that this simple alternative design was feasible and effective); <u>Lindsey v. Caterpillar, Inc.</u>, No. 03-5762, 2007 WL 1816105, at *4-5 (D.N.J. June 22, 2007) (finding use of expert's proposed alternative design in similar product was an indicia of reliability without testing of alternative design); <u>Worrell v. Elliott & Frantz</u>, No. CIV.A. 09-4443, 2013 WL 1628948, at *5 (D.N.J. Apr. 16, 2013) (concluding "[t]he fact that [the expert] did not do any testing does not render his opinion unreliable in this case."

[9] Mr. Rennell's methods must be viewed through the lens of the simplicity of the subject matter and the commonsense conclusion that he reaches. <u>See</u> <u>Kemly v. Werner Co.</u>, 151 F. Supp. 3d 496, 503 (D.N.J. 2015). While the Court's reliability analysis is focused on the methodology employed by the expert, as opposed to his or

that there were several drawbacks to the 3-in-1 blade guard. Specifically, he found that the 3-in-1 guard design made it difficult for operators to perform certain cuts resulting in removal of the guard, and that the effort associated with reattaching the guard made it likely that operators would use the saw without it. Based on these findings, Mr. Rennell opined that Delta unreasonably failed to provide alternative protection for an operator performing certain non through cuts like the rabbeting-type cut in question, and the Unisaw could have been sold featuring the Uniguard as a standard accessory so as to minimize the risk of harm. Mr. Rennell's report makes reference to the following evidence of record in reaching his opinion that the Uniguard represented a feasible, safer alternative. The Uniguard differs from the 3-in-1 guard in that the blade guard is not attached to the splitter, but is an independent "basket" attached to a long pivoting aluminum arm rising from the side of the table. This blade guard can be swung up and out of the way while positioning the piece to be cut, and then lowered back down over the blade. In

---

her conclusions, the Supreme Court has acknowledged that "conclusions and methodology are not entirely distinct from one another." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). That is, it is acceptable for the court to conduct "at least a limited review of the expert's conclusions 'in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.'" In re Human Tissue, 582 F. Supp. 2d at 656 (quoting Heller, 167 F.3d at 152).

other words, the Uniguard mounts easily and it does not need to be removed from the table, whereas it takes half a minute to a minute to remove the 3-in-1 guard (Ponko Tr. 33:4-5). Additionally, the instruction manual provides that the Uniguard "has practically no operational limitations[,]" and makes "even rabbeting safer[.]" Drawing on this information, Mr. Rennell concluded that the Uniguard would not significantly interfere with the use of the Unisaw.[10] Report at 12. The Report also references the "low cost" of incorporating the Uniguard as a standard feature (id. at 14), and Mr. Rennell later clarified in his deposition that the cost would be approximately $170. Rennel Tr. 127. The Court is satisfied that Mr. Rennell's opinions could reasonably flow from these considerations.[11] Because Mr. Rennell's opinions are sufficiently

---

[10] The Court notes that Mr. Rennell did not simply disregard information that the Uniguard could adversely impact the utility of the Unisaw.

[11] Defendant's reliance on Lara v. Delta Intl Mach. Corp., 174 F. Supp. 3d 719 (E.D.N.Y. 2016) is misplaced. In Lara, plaintiff's expert rendered an opinion that the defendant was negligent in manufacturing a saw without an irremovable guard or interlock mechanism to prevent the machine from being operated when the guard is removed, and the expert's proposed alternative did not exist as an optional accessory already sold by defendant. Mr. Rennell's opinion and the circumstances in the case at bar are materially different. First, Mr. Rennell's opinion is not that the Unisaw is inherently defective simply because the 3-in-1 guard is removable. See Rennell Tr. 150:16-23. Rather, his opinion more closely tracks the theory that "the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm." Lewis v. Am. Cyanamid Co., 155 N.J. 544, 570-71 (1998). This understanding is consistent with the pleadings, which allege

tied to the foregoing facts, they are likely to assist a jury in resolving key disputes – namely, whether the detachable nature of the 3-in-1 guard coupled with the failure to include the Uniguard as standard equipment rendered the Unisaw defective.

While defendants certainly raise valid concerns regarding Mr. Rennell's report and testimony, those objections predominately go to the weight of Mr. Rennell's opinions, rather than reliability of the method used to reach them. Under the circumstances, Mr. Rennell's failure to physically inspect the Unisaw, lack of testing of the Uniguard, and alleged inconsistent testimony are best addressed at trial. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof

---

that "the saw was defective and unreasonably dangerous for its intended use in that it failed to include a feasible alternative design which would have adequately guarded Plaintiff's hands and fingers when operating the saw[.]" Amended Compl. ¶ 44; see also, Opp. at 7 ("Mr. Rennell's analysis and opinion articulates how the table saw was not reasonably fit, suitable or safe for its intended purpose because it was designed and marketed in a defective manner in that it did not include a more functional overarm guard[.]" Second, Mr. Rennell does not propose an irremovable guard or interlock mechanism, and the alternative design he does propose exists as an optional accessory already sold by Delta. Considering the information available to Mr. Rennell concerning the already-existing Uniguard's operation and its applications, including the testimony of Mr. Ponko and Delta's instructional materials, it was not necessary that Mr. Rennell conduct testing for his analysis to cross the reliability threshold in this instance. Further, the Court is not in a position to fault Mr. Rennell for not having reviewed the studies of others comparing the 3-in-1 guard to the Uniguard, as it is not apparent any exist.

are the traditional and appropriate means of attacking shaky but admissible evidence."). *Daubert*, 509 U.S. at 596; see also FED. R. EVID. 702 advisory committee note (2000) ("the rejection of expert testimony [on the basis of unreliability] is the exception rather than the rule").

2. Opinion No. 2

> The Delta Unisaw was defective and unreasonably dangerous in that Delta failed to warn and instruct on how to safely perform the type of rip cut being made by plaintiff.

The NJPLA imposes liability on a manufacturer where "the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it . . . failed to contain adequate warnings or instructions." N.J. Stat. Ann. § 2A:58C-2.

In his report, Mr. Rennell concludes that the Unisaw did not contain an adequate warning or instruction because the instruction manual does not describe how to use the guard for a narrow rip cut and the removal of the guard for the subject cut was a foreseeable misuse. Report at 12. Delta challenges these conclusions as net opinions that should be barred. Mot. at 35. In addition to attacking his credentials, Delta specifically contends that Mr. Rennell's opinions are inadmissible because (1) he failed to offer proposed alternative instructions, (2) he failed to test the effectiveness of a possible alternative warning; and (3) his opinions are irrelevant based on plaintiff's testimony that he did not read the Instruction Manual. Mot. at 35-37.

The Court must evaluate Mr. Rennell's opinions under the same indicia of reliability as set forth above. See Milanowicz, 148 F. Supp. 2d at 541 (D.N.J. 2001). In doing so, the Court should apply the appropriate level of flexibility required by Rule 702 and past precedent as opposed to focusing narrowly on any one or more factor(s). By way of example, in Pineda, the Third Circuit found the District Court erred in excluding an expert's opinion regarding the adequacy of a vehicle's instruction manual because the Court focused too narrowly on the expert's failure either to offer proposed alternative language for a warning or to test the effectiveness of alternative warnings. Pineda, 520 F.3d 237, 248 (3d Cir. 2008).

Here, viewing Mr. Rennell's methods through the lens of the simplicity of the subject matter and the commonsense conclusion he reaches, and considering his specific experience and knowledge of table saw guarding, it was not necessary for him to propose alternative instructions or test the effectiveness of a possible alternative warning in order to meet the reliability threshold. In conducting his evaluation, Mr. Rennell considered the testimony of Mr. Ponko and analyzed the Delta instructional materials directing operators on how to make a false fence for a narrow cut. Rennell Tr. 132-134. He observed that page 18 of the instruction manual directs the operator: "When ripping 2 inches or narrower, assemble an auxiliary wood facing to the fence as explained in the section,

30

'USING AUXILIARY WOOD FACING ON RIP FENCE' and use push stick."
Report at 12. However, the corresponding section on page 21
apparently depicts a saw and fence with wood facing that would not
allow the use of a guard. Id. Taking Mr. Rennell's characterization
as true, this portion of the instructions would arguably conflict
with Delta's recommendation that no cuts be made on any table saw
without a guard in place. Ponko Tr. 98. Mr. Rennell elaborates in
his deposition testimony, explaining that a push stick cannot be
used between the fence and the guard when making a one and three-
eights inch cut, and that this condition requires operators to
build a false fence. Rennell Tr. 133:18-21. According to Mr.
Rennell, the instructions are inadequate in this regard because
they fail to direct the user "how to make the proper fence so you
can leave the guard on." Rennell Tr. 133:18-21. Mr. Rennell also
indicates that he reviewed an OSHA investigation document, which
apparently reveals that users of the Unisaw were removing the 3-
in-1 guard for narrow cuts. Id. at Tr. 122. The Court is satisfied
that Mr. Rennell's straightforward opinions could rationally
proceed from these underlying considerations. Because Mr.
Rennell's opinions are sufficiently tied to the foregoing facts,
they are likely to assist a jury in resolving whether the Unisaw
was defective and unreasonably dangerous in that Delta knew that
the 3-in-1 guard would be removed for narrow rip cuts and failed
to properly warn and instruct on how to safely perform the type of

rip cut being made by plaintiff. Again, should this case proceed to trial, Delta will have an opportunity to fully explore and challenge Mr. Rennell's opinions on cross-examination.

Next, the Court addresses the argument advanced by Delta that Mr. Rennell's testimony is irrelevant and must be excluded because plaintiff admitted he did not read the instruction manual and, therefore, nothing in the manual can possibly be a proximate cause of plaintiff's accident. Mot. at 35-37. In adopting this position, Delta essentially argues that experts must provide evidence of a causal link in order to substantiate their opinions concerning a warnings' alleged inadequacies. Although certain courts have excluded expert testimony on this basis,[12] the United States Court of Appeals, Third Circuit, has clarified that in those instances where exclusion may have been appropriate, the causal association between the product itself and the plaintiffs' injuries were "attenuated." Pineda 520 F.3d at 249. Here, there can be little doubt as to the association between plaintiff's injuries and the Unisaw and, thus, for the purposes of this Motion plaintiff need not provide evidence of a causal link. The Court stresses it is not making a judgment on the merits of whether reasonable minds could differ as to whether an adequate warning, if given, would

---

[12] See Allen v. IBM, No. 94-264, 1997 U.S. Dist. LEXIS 8016 (D.Del. May 19, 1997); Higgins v. Diversey Corp., 998 F.Supp. 598, 604 (D.MD. 1997).

have been read and heeded by the plaintiff. This question implicates proximate cause which is not properly before the Court on this Motion.

## Conclusion and Recommendation

Accordingly, for all the foregoing reasons, on this 29th day of October, 2021, it is respectfully recommended that defendants' Motion to Exclude the Testimony and Report of Gerald Rennell be DENIED. The parties shall have fourteen (14) days after being served with a copy of this Report and Recommendation to serve and file any objections with the Clerk of the Court, pursuant to FED. R. CIV. P. 72(b) and L. CIV. R. 72.1(a)(2).


s/ Matthew J. Skahill
MATTHEW J. SKAHILL
United States Magistrate Judge

At: Camden, New Jersey